**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20 C 2683** |
| **v.** | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**[2]

In Social Security disability appeals, the problem of administrative law judges' reliance on vocational expert testimony based on severely outdated listings of jobs available in the national economy is not new to courts in the Seventh Circuit. Vocational experts ("VEs") help the administrative law judges ("ALJs") determine the availability of jobs that claimants can perform with their applicable functional limitations. Accordingly, in many Social Security disability hearings before ALJs, a claimant's eligibility for disability benefits may turn on the VE's testimony, which has, in many cases, relied on a government-generated job list that is now 46 years old. More than eight years ago, the Seventh Circuit expressed bewilderment at how the Directory of Occupational Titles ("DOT"), a U.S. Department of Labor publication last updated in 1977,

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 15, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 22.)

may be of meaningful use in Social Security disability appeals, given that many of the listed jobs have changed or even disappeared:

> We have no idea how vocational experts and administrative law judges deal with this problem. We also have no idea what the source or accuracy of the number of jobs that vocational experts (including the one in this case, whose estimates the administrative law judge accepted without comment) claim the plaintiff could perform that exist in the plaintiff's area, the region, or the nation.

*Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). More recently, the Seventh Circuit noted that "[s]ince 2008, the Social Security Administration has been working on a project to replace the DOT with an updated publication – *a development this court continues to invite.*" *Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022) (emphasis added). In late December 2022, when the Court read a Washington Post news story about the Commissioner's continued use of the DOT in Social Security disability hearings, and of the DOT's continued reference to obsolete jobs like "nut sorter" and "tube operator,"[3] the Court wondered whether we would ever encounter a case in which a plaintiff's claim for benefits was denied after the VE told the ALJ and the claimant that jobs were available for that claimant as a nut sorter.

And then along came this case.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Before the Court are Plaintiff Thomas D.'s[4] motion for summary judgment seeking remand of the final decision of the Commissioner denying his Disability Insurance Benefits ("DIB") (D.E. 29) and the Commissioner's cross-motion to affirm the decision. (D.E. 34.)[5] This matter is before

---

[3] Lisa Rein, "Social Security denies disability benefits based on list with jobs from 1977," *The Washington Post* (Dec. 27, 2022) ("Rein").

[4] Plaintiff's surname has been omitted from this opinion in compliance with the Court's Internal Operating Procedure No. 22.

[5] On February 22, 2020, the Appeals council denied Plaintiff's request for review rendering the ALJ's decision as a final decision of the Commissioner. (R. 786-792.)

the magistrate judge for all purposes, per the parties' joint consent to magistrate judge jurisdiction. (D.E. 20); 28 U.S.C. § 636(c).

This is the third time a district court has reviewed Plaintiff's claims in this 14-year-old case. On January 26, 2009, Plaintiff filed his initial claim for disability insurance benefits ("DIB"), alleging an onset date of June 4, 2007; his date last insured ("DLI") was in December 2012. (R. 14, 827.) After a hearing, ALJ Roxanne Kelsey denied Plaintiff's first claim on December 23, 2010, and Magistrate Judge Arlander Keys remanded that decision. (R. 563-604.) A second ALJ, Edward Studzinski, was subsequently assigned the case, and after another hearing, on September 10, 2014, ALJ Studzinski also found Plaintiff not disabled. (R. 449-73). Thereafter, the Commissioner agreed to a voluntary remand, and Magistrate Judge Michael Mason remanded the case to ALJ Studzinski, specifically ordering him to "redetermine Plaintiff's residual functional capacity and reconsider what specific limitations stem from the Plaintiff's limits in concentration, persistence, and pace." (R. 913). The remand order also directed the ALJ to reevaluate the opinion of treating physician Dr. Swoyer. (*Id.*) ALJ Studzinski held a hearing and on December 4, 2018, denied Plaintiff's claim for the third time. (R. 793-822.) The Appeals Council declined review on February 22, 2020, and it is ALJ Studzinki's latest denial that is before us now. (R. 786-83.)

In all three opinions, the ALJs found Plaintiff able to work at no more than the sedentary level with additional exertional limitations. (R. 16, 18, 454, 456, 793, 795.) Specific to the decision before us, ALJ Studzinski found Plaintiff had the severe impairments of left ankle impairment status-post-reconstruction and flexor digitorum transfer (ankle surgery); pes plano valgus deformities of both feet (flat feet), osteoarthritis of the right knee, and ADHD. (R. 798.) The ALJ assigned Plaintiff an RFC stating that, through his DLI, Plaintiff had the ability to perform sedentary work in that he could lift and carry up to 10 pounds occasionally and lighter weights

frequently. The RFC specifically included no limitation in Plaintiff's ability to sit throughout an eight-hour workday but also limited Plaintiff's ability to sit, such that every 60 minutes, he needed to alternate his position between sitting, standing and walking for no more than five minutes out of every hour without needing to be off-task.[6] The RFC also stated that Plaintiff could stand and/or walk for 15 continuous minutes, and for a total of two hours in an eight-hour workday. Plaintiff could only occasionally operate foot controls, climb ramps and stairs, stoop, kneel, balance, crouch and crawl but was unable to climb ladders, ropes, or scaffolds. Plaintiff needed to be able to use a cane at all times while walking and needed a job that did not require him to ambulate on uneven, slippery or vibrating terrain. Plaintiff's cane would not be required for standing for 15 minutes. Plaintiff was limited to working in non-hazardous environments, i.e., there could be no driving at work, operating heavy machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and he also needed to avoid concentrated exposure to unguarded hazardous machinery. (R. 800.)

Continuing his RFC determination, the ALJ also stated that Plaintiff was unable to perform jobs that required complex reading or writing and was limited to work consisting of simple, routine tasks, work involving no more than simple decision making, no more than occasional and minor changes to the work setting, and work requiring the exercise of only simple judgment. Plaintiff was unable to perform work that required multitasking, and although he could perform work requiring an average production pace, he was not capable of taking on significantly above-average or highly variable production pace work. He was also unable to perform work requiring significant

---

[6] The Court notes the inconsistency in the RFC stating both that Plaintiff has no limitation in his ability to sit for eight hours per day and also that his ability to sit is limited by the need to alternate positions for five minutes every hour. Neither party raises the issue, and we do not base our remand on the inconsistency, but it adds doubt about the reliability of the VE's conclusion as to jobs purportedly available to Plaintiff based on his RFC.

self-direction and was further precluded from work involving direct public service, in person or over the phone; he was able to tolerate brief and superficial interaction with supervisors and co-workers but not able to participate in tandem tasks. Additionally, Plaintiff needed a job that, during break periods, would allow him to elevate either one or both legs to slightly above waist level by resting them on a chair or box or other materials that are readily available in the workplace. (R. 800-01.)

At the hearing, the ALJ had outlined the foregoing RFC for the vocational expert, GleeAnn L. Kehr, and then briefly questioned her about her background:

Q.     Are you familiar with number of jobs in the national economy?

A.     I am.

Q.     Will you tell me any instances in which your testimony conflicts with the Directory of Occupational Titles?

A.     Yes.

(R. 852-53.)

When the ALJ asked the VE whether the national economy had jobs that Plaintiff could perform under his RFC, the VE at first identified the positions of "order clerks" and "address clerks." (R. 854-55.) But the ALJ then elicited from the VE an admission that those "clerk" jobs required a level of reading and writing ability at which the ALJ had concerns with respect to Plaintiff's abilities. (R. 856.) Asked about whether jobs were available requiring less accuracy in reading or less reading overall, the VE testified as follows: "Sure. There would be bench sorting positions, and that would be DOT number 521.687-086, approximately 405,000 positions in the national economy." *Id.* The VE also identified the job of "conveyor off-bearer." *Id.* But in a further discussion, the ALJ asked the VE to identify other jobs that did not require considerable multitasking, were not "office" jobs, did not involve "crowded, hectic environments" (such as a

5

busy restaurant floor), required no more than "brief and superficial" interaction with the public, and were not tandem or team-oriented jobs in which "each team member's job performance is directly dependent on each other team member's job performance." (R. 857, 863-65.) At one point, the ALJ said that his question about available jobs would exclude jobs that were "like Lucy in the chocolate factory, where they just keep turning that machine up faster and faster, and no one could keep up with it." (R. 863.)[7] The VE replied that "conveyor off-bearer" was not such a suitable job, but "[t]he bench sorter, yes." (R. 865.) Pressed by the ALJ for more available jobs suitable to the RFC as the ALJ had described it, the VE added two more: pinking machine operator and press operator, giving the DOT listings. (R. 865-66.) Notably, the ALJ explained to the VE why the ALJ was asking the VE to identify more positions:

> I'm just – this case has been remanded by the District Court twice, so I imagine it's going to go up – to be appealed again if I issue an unfavorable Decision. I'm just trying to – unfortunately, this will be the second time I've decided it, so if it does come back, it'll come back to another judge. I'm just trying to make sure that I cover all the bases here.

(R. 866.)

In the ALJ's opinion denying Plaintiff's claim, the ALJ, after determining Plaintiff's RFC, found that Plaintiff was unable to perform his past relevant work as an order picker and forklift operator. (R. 811-12.) The ALJ then stated in the opinion:

> … I asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. *The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of bench sorter,*

---

[7] *See* "I Love Lucy," Season 2, Episode 1, CBS Television (Sept. 15, 1952); https://www.youtube.com/watch?v=HnbNcQlzV-4. In the iconic chocolate factory scene, Lucy and Ethel are tasked with wrapping pieces of chocolate as the pieces move along a conveyor belt started after their supervisor yells at the belt operator: "Let her roll!" As the increasing speed of the belt overtakes Lucy and Ethel's ability to wrap the chocolates, Lucy shouts: "Listen, Ethel, I think this – I think we're fighting a losing game!" Lucy and Ethel try to conceal from the supervisor their inability to keep up by stuffing the chocolates into their mouths and their clothing. The supervisor re-enters the room, praises Lucy and Ethel for "doing splendidly," and orders the belt operator to "speed it up a little!"

> *a sedentary, unskilled job, of which there are about 405,000 positions in the national economy*; machine operator, a sedentary, unskilled job, of which there are about 52,000 positions in the national economy; and press operator, a sedentary, unskilled job, of which there are about 166,000 positions in the national economy. Pursuant to SSR 00-4p, *I have determined that the vocational expert's testimony is consistent with the information in the Directory of Occupational Titles. Based on the testimony of the vocational expert, I conclude that … the claimant was capable of making a successful adjustment to other work that existed in the national economy.* A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(R. 812-13 (emphasis added).)   The ALJ thus made clear in the decision that his conclusion of "not disabled" was based heavily on the VE's testimony that 405,000 "bench sorter" jobs (and 52,000 machine operator and 166,000 press operator jobs) were available for Plaintiff in the national economy, and on the consistency of the VE's testimony with the DOT.

## II.   ANALYSIS

### A. Overview

Plaintiff takes issue with nearly all of the ALJ's findings in an initial brief that is, to be frank, wandering, confusing, and at times irrelevant.   We commend the Commissioner for her patient response and note that many – although not all – of her points are well taken. Even so, we cannot affirm the decision because of a not-insignificant failure of substantial evidence at Step Five.   In his memorandum of support of his motion for summary judgment, Plaintiff argues that the ALJ erred by relying on general categories of available jobs instead of the actual DOT numbers cited by the VE or their job descriptions, and that it is unlikely enough jobs exist that Plaintiff can actually perform. (Plaintiff's Motion in Support of Summary Judgment ("Pl. Mot."; D.E. 29) at 14.)   It is this issue that compels our remand today.

Specifically, as we explain in more detail below, at least one of the jobs the VE identified by name at the hearing (bench sorter) does not match the DOT number the VE provided and – as

Plaintiff points out – appears to not exist as an individual job in the DOT at all.[8]  Therefore, there appears to be a significant disconnect between the jobs Plaintiff could actually perform, given his RFC, and the job descriptions and estimates provided by the VE, and we thus find substantial evidence does not support the ALJ's finding that significant jobs for Plaintiff exist in the national economy.

In coming to our conclusion, we note that the continued use of the DOT job listings by vocational experts are putting ALJs in a difficult or even untenable position, and one that the ALJ here seemed to understand clearly.  The ALJ (and Plaintiff's attorney) each questioned the VE vigorously about DOT-listed positions that might fit the RFC and carefully excluded from the decision the jobs that the ALJ determined were a poor fit.  The ALJ is to be commended for challenging and pressing the VE on the question of whether particular DOT-listed positions were suitable for a claimant with Plaintiff's limitations.  Unfortunately, though, and for reasons we will not speculate, neither Plaintiff nor ALJ questioned the VE about the reliability of her estimate that 405,000 "bench sorter" jobs existed in the national economy *that Plaintiff could perform.*  The Court, in seeking to determine whether the VE's testimony was sufficiently reliable to support, as substantial evidence, the ALJ's "not disabled" finding here, must undertake its own inquiry into the VE's testimony not only with respect to the job estimates she provided, but more fundamentally in this case, whether she was accurate when she testified that Plaintiff could work as a "bench sorter" at all.

---

[8] We recognize that the two other DOT numbers cited by the VE do refer to particular jobs that include the words "press operator" and "pinking machine operator" in their titles, but as we explain below in our analysis, there are similar problems with precision between the job numbers identified by the VE as "representative" of the jobs Plaintiff can perform and the actual job duties listed in the DOT for those other jobs.

What the VE meant when she said Plaintiff could work as a "bench sorter," it turns out, is a nut sorter, which is the actual job identified by DOT number 521.687-086. This fact is one that no one at the hearing fully clarified or discussed. The words "nut sorter" do not appear in the hearing transcript or the ALJ opinion. Below, the Court examines the consequences, for an analysis of the reliability of the VE's testimony, of the ALJ's decision ultimately resting in large part on a determination that Plaintiff could find work in the national economy as a nut sorter because 405,000 nut sorter jobs are available.[9]

### B. Legal Standard: ALJ Decisions Must Be Supported By Substantial Evidence.

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022). Here, the majority of Plaintiff's arguments concern his insistence that the ALJ wrongly weighed the evidence that

---

[9] The Court was alerted to the bench sorter-nut sorter issue by the Plaintiff, who argued that while it is possible that 405,000 "bench sorter" jobs exist in the national economy, it is unlikely that 405,000 nut sorter positions exist, as illustrated by the VE at Plaintiff's second hearing in 2014, who Plaintiff says testified that only 15,000 nut sorter jobs existed nationally. ("Pl. Mot." at 14.) The Commissioner argues that even if that lower number is the accurate one, it is still a significant number of jobs, *citing Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (Commissioner's Memorandum in Support of Summary Judgment ("Comm. Mem."; D.E. 35) at 18.) But a closer look at the 2014 VE's testimony reveals that she did not actually testify that 15,000 nut sorter jobs existed; she testified that there were 15,000 "sorter" jobs in the national economy before citing to DOT number 521.687-086; the words "nut sorter" were never used and it is unclear when Plaintiff determined that the job about which the VE testified was for a nut sorter and not the undefined "sorter." Because the Commission subsequently agreed to a voluntary remand of the case, the issue of whether Plaintiff or his attorney understood that the sorting job actually referred to a nut sorter or whether the VE's determination of available nut sorting jobs was accurate was not raised in later briefing in that case.

supported his RFC, and we will not contravene those decisions.[10]    Yet at Step Five, an ALJ must determine whether the claimant is able to perform any other work considering his functional limitations, age, education, and work experience.  *See* 20 CFR §§ 404.1560(c)(1), 416.960(c)(1). The ALJ must ascertain whether jobs the claimant can perform "exist[ed] in significant numbers in the national economy." 20 CFR §§ 404.1560(c)(1), 416.960(c)(1); *see* §§ 404.1566, 416.966. For guidance on such questions, ALJs often seek the views of VEs.  *See* §§ 404.1566(e), 416.966(e); SSA, *Hearings, Appeals, and Litigation Law Manual* I–2–5–50 (Aug. 29, 2014). The VEs are professionals under contract with SSA to provide impartial testimony in agency proceedings who must have "expertise" and "current knowledge" of "[w]orking conditions and physical demands of various" jobs; "[k]nowledge of the existence and numbers of [those jobs] in the national economy"; and "[i]nvolvement in or knowledge of placing adult workers[ ] with disabilities[ ] into jobs." *See id.*, at I–2–1–31.B.1 (June 16, 2016); *id.*, at I–2–5–48. Many vocational experts simultaneously work in the private sector locating employment for persons with disabilities. See C. Kubitschek & J. Dubin, Social Security Disability Law & Procedure in Federal Court § 3:89 (2019).

---

[10] For example, Plaintiff argues that his "deformed feet" demand a finding that he is disabled. But the existence of a diagnosis does not automatically equal a finding of disability, *See Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018), and the ALJ acknowledged Plaintiff's limitations due to his pes plano valgus deformity and weighed them against evidence that Plaintiff was able to perform certain daily activities.  The ALJ also properly considered the treatment notes of orthopedic surgeon Dr. Hallman when assigning an RFC that provided for time for Plaintiff to elevate his legs during his break; Plaintiff points to no evidence the ALJ overlooked when deciding Plaintiff did not need to elevate his legs for longer periods. It is Plaintiff's burden at steps 1-4 to demonstrate that he is disabled and to identify specific restrictions imposed by his impairments and the evidentiary basis for those decisions. *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021).  Plaintiff failed to do so, and we will not reweigh the evidence the ALJ considered. Similarly, we do not reweigh the ALJ's decision to give little weight to the opinions of Drs. Hallman and primary care physician Dr. Swoyer; the ALJ cited to substantial evidence of inconsistencies between Dr. Hallman's opinions and treatment notes and the fact that Dr. Swoyer's only treatment notes were dated three years after she wrote her medical opinion and more than a year after Plaintiff's DLI.

When offering testimony, the experts may invoke not only publicly available sources but also "information obtained directly from employers" and data otherwise developed from their own "experience in job placement or career counseling." Social Security Ruling, SSR 00–4p, 65 Fed. Reg. 75760 (2000). *See generally Biestek,* 139 S. Ct. at 1152. Unlike in the first four steps of the sequential evaluation, it is the Commissioner who bears the burden of proof at Step Five of proving that "there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Fetting v. Kijakazi,* — F.4th —, No. 22-1901, 2023 WL 2420881 at *2 (7th Cir. Mar. 9, 2023). As we explain below, we have serious concerns about whether the VE reliably determined that there are jobs in the national economy Plaintiff can perform and find that substantial evidence does not support this determination.

### C. Substantial Evidence Did Not Support the Finding that There Are Jobs Plaintiff Could Perform, Including "Bench Sorter," Which Actually Is "Nut Sorter."

As we recited above, the ALJ commendably pressed the VE with several increasingly limiting hypotheticals, including the one that ultimately became his RFC determination. (R. 853-69.) Ultimately, the VE identified three possible jobs for Plaintiff by job title and Dictionary of Occupational Title number: (1) bench sorter - 521.687-086, (2) pinking machine operator - 692.685-130, and (3) press operator - 715.685-050. Considering these three jobs together, the VE testified that they accounted for approximately 623,000 jobs in the national economy, or 405,000 bench sorter positions, 52,000 pinking machine operator positions, and 166,000 press operator positions. (R. 856, 865-66.) At first blush, that sounds like a lot of jobs. But as Plaintiff points out in his motion for remand, these allegedly available jobs are not what they seem, and therefore, his arguments demand further analysis. The gist of Plaintiff's argument is that the numbers of jobs the VE estimated Plaintiff could perform – given his RFC – appear to be tied to "general categories" of occupations rather than specific DOT codes. Plaintiff claims that substantial

evidence does not support the Commissioner's assertion, and the ALJ's finding, that there are adequate jobs in any category that he could perform. (Pl. Mot. at 14.) We agree.

The analysis is not quite the same as an examination of the reliability of the VE's methodology. In *Fetting,* the Seventh Circuit found that the Plaintiff had forfeited his argument challenging the reliability of the VE's methodology for calculating job estimates because he did not raise it during the hearing, 2023 WL 240881 at *3. The Commissioner argues that a similar forfeiture should apply here, citing *Johnny T. v. Saul*, No. 17 C 18671, 2020 WL 108422 at *8 (N.D. Ill. Jan. 9, 2020). (Comm. Mem. at 18.) But our decision today does not rest on the reliability of the VE's estimate that 405,000 bench sorter positions exist in the national economy. Instead, we remand because it is not apparent that Plaintiff can perform work as a "bench sorter" at all, or that such a job even exists.

The VE's reference to the term "bench sorter," coupled with DOT 521.687-086 and her testimony that "bench sorter" is a representative type of job available to Plaintiff (R. 857), suggests that nut sorter might be just one type of sorting job under the broader category of bench sorter.[11]

---

[11] Although we are led to assume that the DOT contains other types of "bench sorter" jobs, finding them is no easy task. The DOT is divided into nine "occupational definitions" - (1) professional, technical and managerial; (2) clerical and sales; (3) service; (4) agriculture, fishery, and forestry; (5) processing; (6) machine trades; (7) benchwork; (8) structural work; and (9) miscellaneous -- of which at least three (agriculture, processing, and benchwork) might contain relevant jobs. The nut sorter position is found in the "processing" section, and more specifically in the subcategory for occupations involving food processing, and then even more separated into jobs involving "separating, crushing, milling, chopping, grinding and related occupations." This is category "521" from the nut sorter job's DOT number of 521.687-086. And while one might presume that those jobs that begin with number 521.687 all involve the sorting of different types of foods, in fact, a review of this sub-sub-category includes occupations such as "fish chopper" (521.687-058), "Honeycomb decapper" (521.687-070), and "sausage meat trimmer" (521.687-106). We also found "peeled potato inspector" at 521.687-094, which appeared promising, but a closer look at that job revealed that it requires the handling of a knife to quickly cut off bad pieces of potatoes as they pass by on a conveyor belt. We were unable to easily identify or find any other "bench sorter" jobs that involve the same tasks as the nut sorting position within the DOT and thus we remain uncertain if such jobs exist. We can only imagine how difficult a lay person might find navigation of the DOT, and of the confusing manner in which the VE's reliance on it was advanced in this case. We can only imagine how many unrepresented claimants in other matters had no idea what was happening here and no idea of any issue with it, before we even consider whether lawyers for represented claimants might apprehend these

And this highlights our fundamental problem with the ALJ's Step Five analysis: Even if the VE's testimony that 405,000 "bench sorter" jobs exist is accurate or reliable, substantial evidence does not support a finding that Plaintiff is capable of performing all of those jobs, given his RFC, or is only able to perform some subset of those jobs that involve the sorting of nuts. "We do not know how the vocational expert in this case calculated the numbers to which he testified. Nothing in the record enables us to verify those numbers, which the administrative law judge accepted." *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014); *see also Browning v. Colvin,* 766 F.3d 702, 709 (7th Cir. 2014) (remanding in part because the VE identified a job by name that did not match the DOT code and there was no evidence how many jobs matching Plaintiff's abilities actually existed.)

*Browning* is particularly instructive. There, the VE testified that Plaintiff could work as a "hand packer" but the DOT code to which the VE cited was actually for the job of "hand bander (tobac-co), a worker who wraps cigars." *Id.* The court pointed out that the job of "hand packer" does not exist in the DOT, and the closest job, that of "hand packager," included a number of duties that were well beyond Plaintiff's capabilities. *Id.* The same problem has presented itself in this matter, in which the ALJ accepted the VE's testimony that Plaintiff could work as a "bench sorter" when in fact, no such job appears to exist.[12]

---

issues. The Court does not see this sort of confusion as a feature that ought to be included in any mechanism for dispensing justice in any matter.

[12] We also note briefly that the same problem appears with the references to "pinking machine operator" and "press operator" jobs. DOT 692.685-130 ("pinking machine operator - notions and buttons") refers specifically to work on a machine that cuts zippers into individual lengths, and DOT 715.685-050 ("press operator - watches and clocks") apparently does not cover all press operator jobs, but only those that pierce holes and shaves the corners off watch parts. www.occupationalinfo.org/69/692685130, www.occupationalinfor.org/71/715685050. (last visited on March 17, 2023). The VE testified that the job numbers she listed were "representative" (R. 857), but a review of other types of pinking machine operator jobs in the DOT include duties Plaintiff cannot perform per his RFC, such as 686.685-042, which is the operator of a pinking machine in the boot and shoe industry and which requires the operation of a foot

The Court's task in gauging the reliability of the VE's estimates becomes even more difficult when it comes to the VE's assertion that 405,000 "nut sorter" jobs exist in the national economy for Plaintiff. The VE did not testify about all types of "bench sorter" jobs, assuming others exist, nor did she identify any DOT number other than 521.697-086 – "nut sorter" – for this position. The confusion arising from the VE (and the DOT) referring to this job as a "bench sorter" during Plaintiff's hearing is unfortunate. The Court's preference would be for the VE and the DOT to be far more specific and actually use the term "nut sorter" when claimants are told, in effect, that they can find work as nut sorters, and be similarly clear that the job number estimates they provide match with the actual job the claimant can perform. At least then, the claimants, their counsel, and reviewing courts would be crystal clear about nut sorting being so pre-eminent an occupation in the United States that a VE's estimates about the number of available "nut sorting" jobs – 405,000, in fact – could potentially survive scrutiny of the reliability of those estimates. The Seventh Circuit in the past has demanded precision in the use of the job descriptions at hearing. *See Browning*, 766 F.3d at 708-09.

In this case, the term "nut sorter" appeared nowhere in the hearing testimony; only the term "bench sorter" was used. And as we explained above, we have been unable to determine what other positions beyond "nut sorter" the VE might have been talking about when she said Plaintiff could work as a "bench sorter." For our purposes, and on this record, we conclude that the only

---

press. www.occupationalinfo.org/68/686685042.html (last visited on March 17, 2023). Therefore, as with the bench sorting job, it is unclear if the VE's testimony that there are 52,000 pinking machine operator jobs refers only to those in the button and notion industry or to some other larger group of jobs operating other types of pinking machines. We found a similar question when we examined the various types of press operator jobs in the DOT. That is, looking more specifically at those DOT categories, the Court is uncertain whether the 52,000 pinking machine operator jobs or the 166,000 press operator jobs refer only to the specific DOT numbers the VE identified or actually refer to more general categories of jobs, of which the two DOT numbers comprise a smaller subset of available positions.

bench sorting job Plaintiff was said to be able to perform is that of nut sorting, and there is no evidence in the record about the number of nut sorting jobs that exist in the national economy. And thus, the Commissioner did not carry her burden to prove at Step Five that a significant number of nut sorting (or watch trimming or zipper cutting) jobs exist for Plaintiff to perform.

The failure of the VE to distinguish between bench sorting and nut sorting (and press operating and pinking machine operating and zipper and watch-corner cutting) is a sufficient basis for remand for lack of substantial evidence. But we would be remiss in not addressing the larger elephant in the room, which is whether on remand it will be possible to determine if a sufficient number of nut sorting jobs exist in the national economy.

What exactly is a "nut sorter"? As it turns out, as nuts are on their way to their final retail packaging, they travel along a conveyor belt. Sadly, some of the nuts are shriveled. Some are broken. Some are even wormy. Some might contain "foreign" matter, such as rocks or leaves. We know all this from the DOT itself, which states that a "nut sorter" stands near the conveyor belt and "[r]emoves defective nuts and foreign matter from bulk nut meats," "[o]bserves nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks," and also "[p]laces defective nuts and foreign matter into containers." DOT 521.687-086. Depending on the kind of nut meat involved, the job sometimes is "designated" as "Almond Sorter" or "Peanut Sorter." Plaintiff's unfocused challenge to the reliability of the VE's available job estimates does not call out the Commissioner specifically on its reliance on the DOT, but the a few comments about the DOT and reliability of opinions based on it are in order here as we remand.

15

Let us take a closer look at the DOT.[13] Although the Seventh Circuit has recently expressed skepticism about the continued relevance of some of the jobs listed in the DOT, *see Ruenger*, 23 F.4th at 761-62, we recognize that it has not held that the DOT as a whole is no longer reliable as "substantial evidence," even as Judge Posner, writing for the Seventh Circuit, branded the DOT as "an obsolete catalog of jobs" some nine years ago. *Herrmann*, 772 F.3d at 1113. But even while the DOT may still be reliable for determining the significance of *some* jobs in the national economy, and the Court is uncertain of which of those job listings in the DOT are reliable, we envision that some or even many of the jobs described in the DOT are now so obsolete that an ALJ's reliance on a VE's citation to them cannot be considered substantial evidence.[14] We do not reach today the question of whether nut sorter is among those obsolete jobs, although there is plenty of reason to believe this job is obsolete[15]; other courts have so found, or have found that nut

---

[13] www.occupationalinfor.org/dot, (last visited on February 22, 2023).

[14] One need not look much farther on the DOT to find other jobs that seem very likely to be obsolete. Take, for example, the job of "tube operator," another listing on the DOT. U.S. Dep't of Labor, Directory of Occupational Titles, Occupational Group Arrangement, DICOT 239.687-014, 1991 WL 672235 (Jan. 1. 2016). Once upon a time in America, "tube operators" operated pneumatic tubes to transmit information in hard copy form from one place to another. The City News Bureau of Chicago, a local news service founded in 1890, began using pneumatic tubes in the late 19th Century to transmit its news copy to its daily newspaper customers in Chicago, in lieu of copy persons who had hand-carried the copy across the city. By the latter half of the 20th Century, the Bureau automated again, using Teletype machines as the tubes, and their operators, became obsolete. *See* A.A. Dornfeld, *Behind the Front Page* 55-61, 187 (Academy/Chicago Publishers 1983) ("Dornfeld"). Perhaps someday the job of reporter will become obsolete, for better or worse. *See* Paul Farhi, "A news site used AI to write articles. It was a journalistic disaster," *The Washington Post* (Jan. 17, 2023). But the job of "tube operator" already is a relic of the past, and the very presence of that job title on the DOT undermines the reliability of any conclusion grounded in the DOT.

[15] *See* Rein ("In 2022, it is not easy to find a nut sorter (code 521.687-086) in the national economy ...."). The Washington Post's emphasis on the "nut sorter" job as among the outdated DOT occupational listing is telling. The Post noted Department of Labor estimates that in 2022 there were 1,962 nut sorting jobs available, a far cry from even the 15,000 sorting jobs a VE testified existed in 2014. But as Ed Eulenberg of the City News Bureau of Chicago once said, "if your mother says she loves you, check it out." Dornfeld at ix, 206. The Court's attempt to verify the Post's sorting job numbers, or to even determine on its own how many nut sorter jobs currently exist, proved to be nearly impossible. The job statistics table in the Post article cites to SkillTRAN occupational database, www.skilltran.com, as well as the DOL. SkillTRAN provides job reports based on specified criteria such as skill and education needed through its Occubrowse

sorter jobs do not exist in significant numbers in the national economy. *See Abernathy v. Saul*, No. 3:2-CV213-GCM, 2021 WL 1734353, at \*4 (W.D.N.C. May 3, 2021); *Wood v. Berryhill*, No. 3:17-CV-5430-RJB-BAT, 2017 WL 6419313, at \*1-2 (W.D. Wash. Nov. 17, 2017), *report and recommendation adopted*, No. 3:17-CV-5430-RJB-BAT, 2017 WL 6372590 (W.D. Wash. Dec. 13, 2017).

U.S. Magistrate Judge Janis van Meerveld recently looked at the foregoing decisions, and although the judge's report and recommendation stopped short of declaring the "nut sorter" job obsolete, the judge remanded based on the thinness of the record as to the reliability of the VE's estimates. *Carpenter v. Kijakazi*, No. 21-328, 2022 WL 2712592, at \*12 (E.D. La. June 17, 2022), *report and recommendation adopted*, No. 21-328, 2022 WL 2704515 (E.D. La. July 12, 2022). Judge van Meerveld instructed that on remand in *Carpenter*, "the ALJ should consider whether the DOT listings for addresser and nut sorter are reliable and/or whether there is support for the existence of a general office clerk or [nut] sorter job in the present economy that Mrs. Carpenter could perform." *Id.*; *see also Moore v. Berryhill*, No. 4:17-CV-00091-HBB, 2018 WL 1323127,

---

function, and a search according to Plaintiff's RFC shows estimated Dictionary of Occupational Title (DOT) employment numbers per DOT occupation, such as the Nut Sorter title found on page 2 of the report. These statistics, however, do not precisely match those included in the Post article. SkillTRAN-DOT-EstimateReport.pdf. (last visited on March 6, 2023). The Court also reviewed employment data from BLS' Occupational Employment and Wage Statistics ("OEWS") office by visiting https://data.bls.gov/oes/#/home and selecting the applicable search type, geographic area, and occupation. Clicking the search function to look for "one occupation for multiple geographic areas" led to a dropdown menu of dozens of categories, sub-categories, and sub-sub categories of jobs, the most relevant of which appeared to be under "Production Occupations/Food Processing Workers/Miscellaneous Food Processing Workers/Food Processing Workers, All Others." This job is identified as Standard Occupational Classification Code 513099, and according to the BLS, as of May 2021, 46,360 of such jobs existed in the national economy, although the information noted that "estimates for detailed occupations do not sum to the totals because the totals include occupations not shown separately." Occupational Employment and Wage Statistics (bls.gov) (last visited on March 6, 2023). Presumably, the 46,360 food-processing jobs include others in addition to "nut sorter," but the court was unable to establish what those jobs were, given the direction of the BLS.

at *13 (W.D. Ky. Mar. 14, 2018) ("the undersigned is not concluding that these positions [which, in this matter, included a produce sorter] are obsolete, nor that they do not exist in significant numbers. Rather, this is a recognition that Plaintiff has created sufficient doubt to merit remand so that a vocational expert can determine whether these positions, as performed in the modern economy, were still available to the Plaintiff"); *Analia D. v. Berryhill*, No. 2019 WL 856854, at *2 (C.D. Cal. Feb. 6, 2019) ("I've long been leery of a claimant's ability to respond to the agency's proof regarding job numerosity at the fifth step of the sequential analysis. Substantial evidence and common sense do not – and reasonably could not – support the agency's conclusion that thousands of people work every day typing envelopes for a living. That error cannot be harmless under the circumstances of the case.").

On remand, the parties perhaps ought to be concerned by how the estimated number of nut sorter jobs seems to vary, at times wildly, in the published decisions on this subject. In or about April 2013, a VE opined in a Social Security disability case that only 10,000 nut sorter jobs existed in the national economy. *Boomhower v. Berryhill*, No. 3:16-CV-02148-PK, 2017 WL 7167116, at *3, 8 (D. Ore. Oct. 25, 2017). In that same case, a private vocational consultant estimated that only 274 nut sorter positions exist nationally, and that these jobs tended to be "seasonal positions"; the *Boomhower* court remanded, in part because if the consultant's estimate were given significant weight, "it is likely that an ALJ would find the nut sorter job does not exist in significant numbers in the national economy." *Id.* at 9.

The Court is somewhat at a loss to understand how the number of nut sorter jobs might have jumped from 10,000 (considering the estimate in *Boomhower* most generously in the Commissioner's favor) in 2013 to a whopping 405,000 on the date of the July 27, 2018, hearing in this matter. Perhaps the global demand for nuts exploded, or perhaps trends toward automation

in U.S. industries somehow slowed or even reversed, so that suddenly large assortment of nut sorting jobs magically presented themselves. The Court has not the record or the data to know. In a 2021 decision, a Seattle magistrate judge noted that the VE in that case had estimated that only 4,700 nut sorter jobs existed in the national economy. *Catherine G. v. Comm'r of Social Security*, No. 3:20-cv-05741-BAT, 2021 WL 1541178, at *4 (W.D. Wash. Apr. 20, 2021). So at least the estimate in *Catherine G.* suggested that available nut sorting jobs from 2013 to 2021 trended downward, as the Court suspects, and not upward – or, perhaps, after the global uptick in nut demand and the sudden decline of automation as of 2018, those trends reversed again, so that nut sorting jobs dropped precipitously from 405,000 in 2018 to only 4,700 by the end of that decade. In yet another decision, rendered in 2022, another court noted that the VE had estimated the number of nut sorter jobs in the national economy at 450,000. *Benham v. Comm'r of Social Security*, No. 1:20-cv-12876, 2022 WL 1055531, at *3 (E.D. Mich. Feb. 16, 2022). So just a year after *Catherine G.*, the number of available nut sorter jobs is said to be back above 400,000. The rollercoaster-like variance speaks volumes about how unreliable the estimates in any one case may be. The U.S. Supreme Court has held that a VE's refusal to provide a claimant with the data supporting the VE's conclusions does not preclude the VE's conclusions from being supported by substantial evidence. *Biestek*, 139 S. Ct. at 1156. But whether a VE's determination constitutes (or is backed by) substantial evidence remains a case-by-case inquiry. *Id.* at 1157.

> Sometimes an expert's withholding of such data, when combined with other aspects of the record, will prevent her testimony from qualifying as substantial evidence. That would be so, for example, if the expert has no good reason to keep the data private and her testimony lacks other markers of reliability. But sometimes the reservation of data will have no such effect.

*Id.* In this matter, the issue is not so much a withholding of data by the expert, and the narrowness of our holding results in a remand before we reach the issue of reliability of the VE estimate of

405,000 bench sorter jobs (which actually were nut sorter jobs). But the Court cannot help but mention here that its difficulty in knowing how the 2014 VE's estimate of 15,000 sorter jobs might square with the 2018 VE's estimate of 405,000 bench sorter jobs in the national economy raises serious questions about the reliability of any such VE estimates.

We also question how well-equipped ALJs may be to probe the reliability of a VE's job estimates based on the outdated DOT. We cannot help but observe that our result today is somehow unfair to the erstwhile ALJ, who so diligently narrowed the VE's testimony about the kinds of jobs Plaintiff could perform, based on the ALJ's concerns about the Plaintiff's ability, for example, to function in a hectic or fast-moving environment. The ALJ now finds his opinion reversed because of other issues neither he nor Plaintiff explored, and yet nor did the ALJ or Plaintiff receive clarity from the VE that she was actually saying Plaintiff could work as a nut sorter. Instead, the ALJ and Plaintiff heard the more obtuse, indefinite term "bench sorter." The ALJ had to contend with the severely outdated DOT, the VE's reliance on it, the VE's failure to be clear that "bench sorter" means "nut sorter," and Plaintiff's incomplete apprehension of what he was being told at the hearing. The ALJ already was concerned with determining whether the VE's suggested jobs might fit within Plaintiff's RFC. In this environment, like Lucy and Ethel in the chocolate factory, the ALJ perhaps was fighting a losing game. "Let her roll!" the process bellowed, DOT in hand. But rolling out the DOT with its lack of clarity about whether and how many jobs exist for Plaintiff as bench sorter – whatever that is – does not allow the Court to conclude that substantial evidence supports the result here.

We are not alone in our concerns about the severely outdated DOT. As noted by the *Ruenger* Seventh Circuit panel, "since 2008, the Social Security Administration has been working on a project to replace the DOT with an updated publication—a development this court continues

to invite." *Ruenger,* 23 F.4th at 762. This Court joins the Seventh Circuit in inviting the creation of a more up-to-date and reliable list of jobs that accurately reflects both the tasks involved and the numbers available. It should not have taken a Washington Post newspaper story to call attention to the glaring inadequacy of a 46-year-old job listing that includes positions like nut sorter and tube operator. Another year should not have passed since the Seventh Circuit's decision in *Ruenger* without completion of the task of updating the DOT so that obsolete or seemingly obsolete jobs are no longer listed and no longer relied upon by VEs and ALJ. Eight years should not have passed since the *Browning* decision without completion of that project. Probably it would be for the better if the agency or its VEs altogether stopped telling claimants that they could work as nut sorters, including Plaintiff on remand. But that is for the Commissioner to decide. In the meantime, the Court cannot conclude that substantial evidence backed a benefit denial that relied on the unclear and opaquely articulated notion that a job is out there for Plaintiff as a "bench sorter."

## III.    CONCLUSION

For the foregoing reasons, the ALJ's determination was not supported by substantial evidence. Accordingly, the Court grants Plaintiff's motion to remand (D.E. 29), denies the Commissioner's summary judgment motion (D.E. 34), and remands the case for further proceedings consistent with this opinion.

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: March 17, 2023**